UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEXJET, LLC, a Florida limited liability
company,

   Plaintiff,

v.              Case No: 8:14-cv-538-T-17TBM

BIG DOG MEDIA SOLUTIONS, LLC, a
Colorado limited liability company,
BARRETT SIMMS, an individual,
STEVEN CUDZILO, an individual, and
DUSTIN FLOWERS, an individual,

   Defendants.

_____/

## PERMANENT INJUNCTION BY CONSENT
## AGAINST DEFENDANT DUSTIN FLOWERS

  This cause came before the Court by agreement of Plaintiff LexJet, LLC ("LexJet" or "Plaintiff") and Defendant Dustin Flowers ("Flowers").  Upon consideration of Plaintiff's and Flowers's agreement to resolve all of Plaintiff's claims brought against Flowers in this matter, Plaintiff's and Flowers's stipulation to the following findings of fact and conclusions of law, and the evidence before the Court, the Court enters a permanent injunction by consent against Flowers as set forth below.  Pursuant to Rules 52(a) and 65(d), Federal Rules of Civil Procedure, the Court enters the following injunction, findings of fact, and conclusions of law.

### Findings of Fact

A.  **LexJet's Business**

  1.  LexJet is a leading provider in the highly competitive and specialized industry of selling professional-grade, wide-format inkjet printing equipment, media, and supplies. LexJet primarily sells to end users who create graphics for their own commercial purposes or who resell

EXHIBIT 1

to other end users. From its headquarters in Sarasota, Florida, LexJet serves customers throughout North America, including in Florida.

2.      LexJet competes with other sellers on a local, regional, and national level. Because of the large number of competitors in the market and a limited pool of customers, the industry is highly competitive. This competition is driven in part by customer's changing needs and technological advancements in the industry, which require LexJet to establish and maintain strong customer relationships to survive and grow as a business.

3.      LexJet has been in business for nearly two decades. During that time, LexJet's success has been largely attributable to its numerous and significant customer relationships, including for example its relationships with MillerCoors, Coca-Cola, UPS Store, and Café Press, and to its competitively priced products. For sales and marketing purposes, LexJet divides its customers into a number of different market segments. These include:

- Exhibit House – customers who produce graphics for conferences, trade shows, job fairs, and other similar events;

- Fine Art Reproduction – customers who reproduce fine art for the hospitality industry or for retail sale;

- In House – large corporate customers with internal graphics needs; and

- Large Format Service Bureau – customers who produce banners, signs, posters, and other large format graphics.

4.      LexJet has invested and continues to invest significant resources in developing and maintaining these customer relationships. To identify the particular needs of its customers and create solutions for those needs, LexJet focuses on delivering unparalleled customer service and support. LexJet employs a team of sales representatives, who are the company's primary

2

points of contact with its customers and potential customers, to deliver this support. LexJet spends significant time and resources preparing its sales representatives to interact with customers.

5.   For example, LexJet provides eight weeks of training to new employees on developing customer relationships through phone sales. Although most of LexJet's customer contacts are by telephone, LexJet's sales representatives also frequently have contact with customers via e-mail. Accordingly, LexJet also provides business writing training to new employees. Additionally, employees are given product training for all of LexJet's products and are encouraged to talk to the company's customers about ways LexJet can help their businesses. LexJet believes that it is not just selling products, but is selling a service to its customers. Thus, LexJet's success in this industry is dependent in large part on its relationships and contacts with its customers and potential customers. LexJet also attributes its success to its competitive pricing structure. LexJet has developed and maintained competitive prices for its many products, which enable the company to generate sales to new and existing customers.

6.   Throughout its existence, approximately 70% of LexJet's customers are repeat customers. These repeat customers account for more than 85% of LexJet's revenues, on an approximate yearly basis.

**B.   LexJet's Confidential and Proprietary Customer List and Pricing List**

7.   To perform their jobs, sales representatives are given access to specific information concerning LexJet's customers and potential customers. This information is collected and stored in an electronic database on LexJet's computer network. The information includes, but is not limited to, customer contact information, including place of business, e-mail addresses and phone numbers, and various individual contacts within the organization (such as sales manager,

3

production manager, and accounting manager), make and model of printing or other graphics equipment used by the customer, type of software used to drive the printers, previous marketing contacts with the customer, the customer's web activity, a description of logged conversations with the customer, billing and shipping information, a classification of the customer by LexJet market segment, and the LexJet sales representative assigned to the account (the "Customer List").

8.      Sales representatives are also given access to specific information concerning LexJet's product pricing and costs. Like the Customer List, this information is collected and stored in an electronic database on LexJet's computer network. The information includes, but is not limited to, product descriptions, product IDs, prices, cost, weight, dimensions, and margin (the "Pricing List").

9.      LexJet's Customer List and Pricing List are unique and proprietary collections of information developed and used by LexJet in its business. The Customer List contains customer information that is not publicly available and that is specific to LexJet. The Customer List also contains information created by LexJet exclusively for employee training purposes. The Pricing List contains pricing, cost, and margin information that is not publicly available and that is specific to LexJet.

10.     LexJet sales representatives are authorized to use the Customer List and the Pricing List in the scope of their employment to contact and sell products to current and potential customers. As a result of their frequent contact with customers, sales representatives use the Customer List and Pricing List on a regular basis as part of their jobs.

11.     LexJet considers the Customer List and Pricing List to be confidential and proprietary property of the company for its exclusive use and benefit. LexJet has developed the

Customer List and Pricing List through the expenditure of substantial time and resources since the company's founding, including but not limited to investments of time and resources in employee training and creation and maintenance of a detailed database of the company's customers, i.e. the Customer List, and product pricing, i.e. the Pricing List. LexJet's success depends in large part upon the confidential and proprietary information contained in its Customer List and Pricing List.

12.      LexJet takes a number of steps to protect the confidentiality of the Customer List and Pricing List. For example, before being hired, LexJet runs a background check on prospective employees to discover criminal activity, to verify employment history, and to consult references. LexJet also requires employees to sign a LexJet Corporation Team Guidebook (the "Employee Guidebook"), which provides, among other things, that employees "will have access to confidential and proprietary information including certain trade secrets. This information includes, but is not limited to, personnel information, pricing, customer lists, contractual agreements, intellectual property and marketing/sales strategies. It is a condition of employment that you not disclose this information to third parties during or after employment." The Employee Guidebook currently in effect is substantially and materially the same as the Employee Guidebook in effect when Flowers worked for LexJet, as discussed below.

13.      Since approximately 2006, employees are also required to sign an Acknowledgement of Information Security Policy, which provides, among other things, that:

> I understand and agree that any computers, software, and storage media provided to me by the company contains proprietary and 6 confidential information about LexJet and its customers or its vendors, and that this is and remains the property of the company at all times;

> I agree that I shall not copy, duplicate (except for backup purposes as part of my job here at LexJet), otherwise disclose, or allow anyone else to copy or duplicate any of this information of software.

14.     LexJet further protects the confidentiality of its Customer List and Pricing List by allowing employees to access the Customer List and Pricing List only through password protected computers. Customers and non-LexJet employees are not given access to the Customer List or Pricing List. The Customer List and Pricing List are intended to be used exclusively for LexJet business. LexJet does not allow its former employees to use the Customer List or Pricing List for any purpose.

### C.     Former LexJet Employee Flowers

15.     In approximately January 2006, LexJet hired Flowers as a sales representative.

16.     During his employment, Flowers was given access to LexJet's Customer List and Pricing List for use in connection with his employment. Flowers's employment was terminated on May 9, 2013.

17.     Upon separation from LexJet, Flowers and LexJet entered into a Severance and Release Agreement. The Severance and Release Agreement further protects the confidentiality of the Customer List and Pricing List, and provides, among other things, that:

> Mr. Flowers agrees to take all necessary means to safeguard and protect the confidentiality of all Confidential Information. For the purposes of this Agreement, "Confidential Information" shall mean 7 all information, in any form, possessed by LexJet and relating to LexJet's business, operations, finances, legal matters, or Business Associates, regardless of whether such information is verbal or written, was learned by Mr. Flowers intentionally or inadvertently, or is learned directly or indirectly because of Mr. Flowers' relationship with LexJet. Confidential Information shall include all information that may legally be protected, even though portions of such information may be publicly available, or may be available to certain third parties or others having arrangements or contractual relationships with LexJet. . . . The obligations of Mr. Flowers under this Confidentiality provision shall continue in effect indefinitely, or as long as

6

permitted by law. Without limiting the definition of Confidential Information, the following are examples of Confidential Information: . . .

vi.  Trade secrets, formulas, patterns, compilations, programs, materials, methods, LexJet's, [sic] techniques, processes, know-how, and patentable and non-patentable inventions related to Released Parties' businesses.

(emphasis in original).

18.    The Severance and Release Agreement also provides:

Mr. Flowers agrees that all documents, information, and intellectual property purchased, possessed or created by any employee of LexJet, including Mr. Flowers, during employment and relating to the Business constitute Proprietary Information and are owned by LexJet. The obligations of Mr. Flowers under this provision shall continue in effect indefinitely, or for as along as permitted by law. Upon separation, Mr. Flowers will:

i.    Immediately cease use of all Proprietary Information;
ii.   Return all copies of Proprietary Information to LexJet;
iii.  Promptly notify LexJet of any third party duplication, distribution, or use of any Proprietary Information or Confidential Information which comes to the attention of Mr. Flowers and provide LexJet with whatever reasonable assistance is necessary to stop such activities; and
iv.   Execute any documents and take all reasonable steps to carry out this provision and protect LexJet's rights regarding its Proprietary Information.

**D.    Flowers Wrongfully Uses the Customer List and Pricing List**

19.    Flowers is or at one time was in unauthorized possession of the Customer List or Pricing List.  While working for Big Dog Media, Flowers improperly used the Customer List or the Pricing List, or the information in those lists, to solicit LexJet's customers, including customers in Florida, for Big Dog Media's competitive benefit.  LexJet has provided and hopes to continue providing goods and services in the future to its customers that Flowers contacted while working for Big Dog Media.

20.    Flowers does not have authorization to possess or use the Customer List or

7

Pricing List, or any of the information in those lists.

21.     LexJet will never know all of the customers contacted by Big Dog Media or Flowers, and will never know all of the customers who stopped purchasing from LexJet because of Big Dog Media's or Flowers's improper use of the Customer List and Pricing List. This problem is compounded because of the repeat business LexJet enjoys from its customers. Accordingly, it is impossible to quantify fully LexJet's lost sales.

22.     The termination of LexJet's relationships and expectancies with any of the customers identified on the Customer List as a result of the unauthorized and improper use of that information, along with the unauthorized and improper use of the Pricing List to solicit business from LexJet's customers, will undermine LexJet's business and cause the company irreparable harm.

23.     Any finding of fact deemed to be a conclusion of law is herby adopted as such.

### Conclusions of Law

1.     This Court has the power to grant permanent injunctive relief upon a showing that (1) plaintiff has a substantial likelihood of succeeding on the merits, (2) plaintiff will suffer irreparable injury if the injunction is not granted, (3) the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) granting the injunction would not disserve the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). The burden is on the moving party to establish the prerequisites to injunctive relief. *Id.* (citing *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1262-63 (11th Cir. 2004)).

2.     To prevail on its FUTSA claim, LexJet must prove at trial that LexJet's Customer List and Pricing List are trade secrets pursuant to FUTSA and the Defendant's actions constitute misappropriation under FUTSA. Based on Sections 688.002(2) and (4), Florida Statutes, and the

evidence before the Court, the Court concludes that LexJet's Customer List and Pricing List are trade secrets pursuant to FUTSA and that Defendant's actions constitute misappropriation under FUTSA.

3.     The Court finds that LexJet enjoys a substantial likelihood of prevailing on the merits of its claim for violation of FUTSA, Count VI of the Complaint.

4.     For the other reasons set forth above, along with the evidence presented to the Court, the Court also finds that LexJet is substantially likely to prevail on its remaining claims.

5.     The Court further finds that LexJet will suffer irreparable harm without a permanent injunction maintaining the status quo.

6.     A permanent injunction in this case will serve the public interest.

7.     A bond requirement should be waived. This Court has the discretion when setting the amount of the bond presumptively required by Rule 65, Federal Rules of Civil Procedure. *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996); *see also Broward Coalition of Condos., Homeowners Ass'ns & Cmty. Orgs. Inc. v. Browning*, 2008 WL 4791004 (N.D. Fla. Oct. 29, 2008).

8.     The waiver of the bond requirement is appropriate based on the public interest aspects of this litigation, the fact that Flowers is unlikely to suffer significant damage from a permanent injunction, and the fact that Flowers has agreed to entry of this permanent injunction.

9.     Any conclusion of law deemed to be a finding of fact is herby adopted as such.

### Form and Scope of Permanent Injunction

10.    The Court finds that based on the forgoing analysis LexJet has satisfied the requirements for a permanent injunction. Accordingly, it is ORDERED and ADJUDGED that a permanent injunction is ENTERED against Defendant Dustin Flowers.

11.     Flowers, his agents, servants, employees, successors, assigns, affiliates, joint venturers, and any and all other persons in active concert, in privity, or in participation with him are hereby ENJOINED from:

(i)     using, disclosing, divulging, copying, sharing, transferring, or relying on any of LexJet's confidential and proprietary information, including without limitation any of the information set forth in the Customer List or Pricing List;

(ii)    directly or indirectly interfering with LexJet's business and contractual customer and referral relationships, including without limitation contacting or soliciting for the purposes of business any party listed on the Customer List; and

(iii)   otherwise using the information set forth in LexJet's Customer List or Pricing List for any competitive purpose.

12.     Flowers is hereby Ordered to:

(i)     immediately produce to Plaintiff's counsel any and all documents or pieces of information, as well as any related or derivative documents, no matter the format, in his care, control, or custody that contain or contained LexJet's Customer List or Pricing List; and

(ii)    immediately produce to Plaintiff's counsel any computer or other electronic storage device in his care, custody, or control on which he accessed or saved LexJet's confidential and proprietary information, including the Customer List or Pricing List.

13.     This permanent injunction shall be effective immediately upon entry of this Order and shall remain in effect until further order of this Court.

14.     The Court retains jurisdiction to make any other orders that are necessary or proper to construe, enforce, or implement the terms of this permanent injunction.

DONE AND ORDERED in chambers in Tampa, Florida, this 19th day of May, 2014.

United States District Judge

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

10