# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**LEXJET, LLC, a Florida limited
liability company,**

        **Plaintiff,**

**v.**                                              **Case No. 8:14-cv-538-T-17TBM**

**BIG DOG MEDIA SOLUTIONS, LLC,
a Colorado limited liability company, et. al,**

        **Defendants.**

_____/

## REPORT AND RECOMMENDATION

      THIS CAUSE is before the Court on referral for a Report and Recommendation on

**Plaintiff's Motion for Preliminary Injunction** (Doc. 5) and Defendants Barrett Simms and

Big Dog Media Solutions, LLC's response in opposition (Doc. 24).[1]  A hearing on the Motion

---

[1]The parties also filed affidavits and other documentary evidence.  (Docs. 6-8, 23, 26, 56).  At the hearing, Defendants provided a disc as a supplement to the Declaration of Barrett Simms (Doc. 23), which was admitted as an exhibit.  In addition, Plaintiff proffered several exhibits to the Court, which the Court later accepted as exhibits to the hearing.  (Docs. 60, 68).  Defendants, in opposition, filed the Supplemental Declaration of Barrett Simms.  (Doc. 64).

      Also pending before the Court is **Defendants' Motion to Strike Supplemental Declaration of Arthur Dean Lambert, Jr. and Exhibits to Same** (Doc. 58) and Plaintiff's response in opposition (Doc. 61).  By Defendants' Motion to Strike (Doc. 58), Defendants seek to strike from the record the Supplemental Declaration of Arthur Dean Lambert, Jr. and its exhibits 1 and 2 (Doc. 56).  Defendants argue that the supplemental declaration was untimely filed as both the motion for preliminary injunction and response in opposition have been filed.  Defendants urge that they are prejudiced by the late filing and will not have an opportunity to rebut the contents of the supplemental declaration.

      In opposition (Doc. 61), Plaintiff argues that the supplemental exhibit is essentially a corrected exhibit that contains the same confidentiality provision as in the version originally filed and thus in no way prejudices Defendants.  At the time of the filing of its Motion, Plaintiff had not located a copy of the LexJet Corporation Team Guidebook and instead

was conducted July 30, 2014.  For the reasons set forth herein, I recommend the motion for preliminary injunction be denied.

LexJet, LLC ("LexJet" or "Plaintiff") is a limited liability company organized under the laws of Florida, headquartered in Sarasota, Florida.  It purports to conduct business throughout the United States selling professional-grade, wide-format inkjet printing equipment, media, and supplies.  Defendant Big Dog Media Solutions, LLC ("Big Dog") is a limited liability company organized under the laws of Colorado that competes in the same industry.  Barrett Simms ("Simms"), the principal of Big Dog and former employee of LexJet, is a resident of Colorado.  Steven Cudzilo ("Cudzilo"), a current employee of Big Dog and former employee of LexJet, is also a resident of Colorado.[2]  *See* (Doc. 40).

---

provided the Team Guidebook written for S-One Holdings Corp., the successor to LexJet. Subsequently, Plaintiff located a copy of the LexJet Guidebook and supplemented the Lambert Declaration.  In the circumstances, Defendants cannot claim real prejudice.

Upon consideration, **Defendants' Motion to Strike Supplemental Declaration of Arthur Dean Lambert, Jr. and Exhibits to Same** (Doc. 58) is **denied**.

[2]Defendant Dustin Flowers, originally a subject of the instant motion, agreed to the entry of a permanent injunction, and thus the Motion no longer pertains to him.  Reference herein to "Defendants" or other such wording in this Order should not be construed to pertain to Dustin Flowers.

In March 2014, LexJet filed its ten-count Complaint.[3]  In short, LexJet alleges that while Mssrs. Simms and Cudzilo were employees at LexJet, they had access to confidential and proprietary customer and pricing information.  At all times during their employment, they each owed LexJet a duty of loyalty to exercise diligence and good faith in matters relating to their employment.  Simms, in particular, signed a LexJet Corporation Team Guidebook ("Employee Guidebook") that stated it was a condition of employment that the employee not disclose the confidential and proprietary information to third parties during or after employment.  Plaintiff alleges that after their employment was terminated, and Big Dog was formed, these Defendants used and disclosed LexJet's confidential information related to customers and pricing.

In Answer, Big Dog, Simms, and Cudzilo generally deny the allegations of impropriety.  Additionally, they raise multiple defenses in response to the Complaint.  (Docs. 22, 30).

---

[3]The ten counts are as follows: (1) breach of employee fiduciary duties against the employee Defendants (Count I); (2) breach of contract against Simms, specifically the Employee Guidebook Agreement (Count II); (3) breach of contract against Flowers, specifically the Information Security Policy Agreement and Severance Agreement (Counts III and IV); (4) breach of implied contract against Cudzilo (Count V); (5) violation of the Florida Uniform Trade Secrets Act against all Defendants (Count VI); (6) tortious interference with business and contractual relationships against all Defendants (Count VII); (7) civil conspiracy against all Defendants (Count VIII); (8) common law unfair competition against all Defendants (Count IX); and (9) breach of implied covenant of good faith and fair dealing against Simms and Flowers (Count X).  Among other relief sought, LexJet seeks preliminary and permanent injunction against further infringement.

I.

By its Motion for Preliminary Injunction (Doc. 5), Plaintiff seeks to enjoin Big Dog, Simms, and Cudzilo from using, disclosing, or relying on any of LexJet's confidential and proprietary information including its customer lists and pricing lists and to require the return of such materials.  Plaintiff claims Defendants have misappropriated trade secrets and are using such to compete against Plaintiff.  By Plaintiff's account, the industry of selling professional-grade, wide-format inkjet printing equipment, media, and supplies is highly competitive due to the large number of competitors and limited pool of customers.[4]  The competition is driven in part due to customers' changing needs and technological advancements in the industry, which require LexJet to establish and maintain strong customer relationships to survive and grow as a business.  Thus, Plaintiff asserts that its success in the industry is dependent on its relationships and contacts with its customers and potential customers, as well as its competitive pricing structure which has enabled it to generate sales to new and existing customers.  Plaintiff represents that approximately 70% of its customers are repeat customers, accounting for more than 85% of its annual revenues.  LexJet considers its customer list and its pricing list to be confidential and proprietary property for its exclusive use and benefit.  *See* (Docs. 5, 7-1).

Simms worked for LexJet from June 2003 to June 2009 as a sales representative. Cudzilo worked for LexJet from February 2003 to August 2008 as a sales representative. Plaintiff alleges it recently discovered that Simms and Cudzilo copied or otherwise procured

---

[4]In support, Plaintiff files the Declaration of Arthur Dean Lambert, Jr., Vice President of Sales for LexJet.  (Doc. 7-1).

for themselves copies of the customer and pricing lists while employed by LexJet and are now using such matters for the competitive benefit of Big Dog.  LexJet claims that Big Dog has contacted its customers whose e-mail addresses were taken from LexJet's Customer Lists. "On information and belief," Plaintiff asserts that Big Dog actively continues to use LexJet's customer and pricing lists.  Such activities, it alleges, will undermine its business and cause LexJet irreparable harm.

Plaintiff contends that neither Simms nor Cudzilo had authorization to procure the lists for their own benefit.  While it admits that during the scope of their employment sales representatives at LexJet are authorized to use the customer and pricing lists to contact and sell products to current and potential customers and that such lists are used on a regular basis by the sales representatives as a part of their jobs, LexJet contends Simms and Cudzilo were obligated to return the information to LexJet upon their termination with the company and they did not.  It offers the declaration of a former employee, Jason Tobin, who states his understanding that LexJet's customer and pricing lists could only be used in connection with LexJet's business.  After leaving LexJet and taking a job with Big Dog in 2013, Tobin was shown a copy, in electronic form, of LexJet's customer list by Simms.  He was also provided a copy of LexJet's pricing data.  On at least three occasions, Big Dog sent email blasts to recipients whose email addresses were taken from LexJet's customer data.  While employed with Big Dog, Tobin was asked to contact LexJet customers to solicit their business.  (Doc. 8-1).

Moreover, LexJet contends that its Customer List[5] and Pricing List[6] contain information that is not publicly available and that is specific to LexJet.  The lists are stored in an electronic database on LexJet's computer network that employees can access only through password protected computers.  It urges that the lists have been developed through the expenditure of substantial time and resources, including the investment of time and resources in employee training and in the creation and maintenance of the databases.

LexJet claims to take a number of steps to protect the confidentiality of the lists. Among them, LexJet performs background checks on new employees and has required employees to sign a LexJet Corporation Team Guidebook ("Employee Guidebook"),[7] an Acknowledgment of Information Security Policy, and a Severance and Release Agreement.

---

[5]The Customer List contains information such as customer contact information, which includes place of business, e-mail addresses, phone numbers, individual contacts within the organization; make and model of printing or other graphics equipment used by the customer; type of software used to drive the printers; previous marketing contacts with the customer; the customer's web activity; a description of logged conversations with the customer; billing and shipping information; a classification of the customer by LexJet market segment; and the LexJet sales representative assigned to the account.  The Customer List also includes information created by LexJet exclusively for employee training purposes.

[6]The Pricing List includes information such as product descriptions, product IDs, prices, costs, weight, dimensions, and margins.

[7]Pertinent to LexJet's Motion is the provision from the Employee Guidebook, which provides:

> In the normal course of employment, employees of [LexJet] will have access to confidential and proprietary information including certain trade secrets.  This information includes, but is not limited to, personnel information, pricing, customer lists, contractual agreements, intellectual property and marketing/sales strategies.  It is a condition of employment that you not disclose this information to third parties during or after employment.

*See* (Docs. 7-2 at 9; 56-2 at 9).

6

LexJet offers no proof that either Simms or Cudzilo were subject to a background check or signed either of the latter two documents.  LexJet contends that Simms signed the Employee Guidebook.  *See* (Doc. 56-3).  As for Cudzilo, Plaintiff urges that during the course of his employment with LexJet, through LexJet's words and actions, Cudzilo was on notice that LexJet considered the lists to be confidential and protected, and he was thus under an obligation not to use or disclose the information.  (Doc. 1, ¶ 44).

On this basis, LexJet argues that Defendants now have unauthorized possession of the Customer List and Pricing List and are using the information for their competitive benefit.  Plaintiff proffers a customer's declaration (Doc. 6-1),[8] wherein the customer notes that it was the recipient of a December 5, 2013, email from Big Dog soliciting business (Doc. 6-2).  The recipient's email address is one that is not available to the public and LexJet is the only company that the customer has communicated with using that email address to purchase or solicit offers for wide-format printing equipment or supplies.  The customer contends that it has never used that email address to communicate with anyone from Big Dog.  Moreover, according to Lambert's Declaration, he has learned that other LexJet customers were contacted by Big Dog and "on information and belief," he thinks Big Dog actively continues to use the lists without authorization.  (Doc. 7-1).  By Lambert's account, it is impossible to quantify LexJet's lost sales from such activity.

---

[8]An unredacted version identifying the customer was submitted under seal to the Court.

Accordingly, Plaintiff seeks issuance of a preliminary injunction, precluding

Defendants from:

> (1) using, disclosing, divulging, copying, sharing, transferring, or relying on any of LexJet's confidential and proprietary information, including without limitation any of the information set forth in the Customer List or Pricing List;

> (2) directly or indirectly interfering with LexJet's business and contractual customer and referral relationships, including without limitation contacting or soliciting for the purposes of business any party listed on the Customer List; and

> (3) otherwise using the information set forth in LexJet's Customer List or Pricing List for any competitive purpose.

It also requests for the Court to require Defendants to:

> (4) immediately produce to Plaintiff's counsel any and all documents or pieces of information, as well as any related or derivative documents, no matter the format, in their care, control, or custody that contain or contained LexJet's Customer List or Pricing List;

> (5) immediately produce to Plaintiff's counsel any computer or other electronic storage device in their care, custody, or control on which they accessed or saved LexJet's confidential and proprietary information, including the Customer List or Pricing List; and

> (6) submit to the Court within ten (10) days an Affidavit confirming compliance with these terms and describing, as necessary, the disposition of any of the aforementioned information that Defendants no longer possess.

(Doc. 5).

In response, Defendants oppose the entry of a preliminary injunction. They contend that the parties are competitors in a highly competitive market where success in attracting customers depends on personal customer contact, technical expertise, and service. They concede that Big Dog sells proprietary, private label products that are functional substitutes for LexJet products but are not identical. Most of the parties' customers are retail service businesses that advertise to the public and are well-known to the parties. The companies'

8

products are viewed as commodities by the customers, who have no fixed-term relationships and who seek price discounts and to diversify their vendors. *See* (Docs. 23, 24).

Simms admits that he and his company, Big Dog, are in possession of some "antique" databases and lists originating from LexJet. However, the databases and lists came to Simms legally and, because of the age, all of the information is commercially obsolete and without value. The information does not provide any advantage to Big Dog in dealing with its customers and potential customers. Simms left LexJet in June 2009 and formed Big Dog in the summer of 2009. Big Dog focused on the exhibit and trade show segment of the industry because of Simms' familiarity with those segments. It made its first sale in October or November 2009. Cudzilo was hired by Big Dog sometime after April 2010. In 2013, Big Dog hired Dustin Flowers and Jason Tobin, also former sales reps for LexJet. According to Simms, none of these individuals provided Big Dog any database information or documents originating with LexJet. *Id.*

On LexJet's claim that such matters were trade secret and confidential, Simms maintains that while he was with LexJet he and other sales representatives had unrestricted access to LexJet customer and pricing information; he was never told that the customer and pricing information was not to be printed, downloaded, or emailed, nor was such secured in any way. To his knowledge, LexJet sales representatives were not subject to any background check. LexJet pricing information was freely available to all employees and sales representatives in the form of an online database and Excel price sheets. A database set forth the "list price" or initial price, costs, and margins for various LexJet products. Customer information was not marked confidential. Since LexJet's sales representatives work on

commission and had the authority to discount prices in order to close sales, the prices on the price lists usually did not match actual transaction prices, which would be negotiated individually with the customers.  Pricing lists in the Excel spreadsheet form were marked "confidential."  However, Simms believes that the designation pertained only to the cost and margin information as list pricing has always been posted on LexJet's website.  Simms states that in January 2004, he was asked to sign a one to two page document as a condition to his continued employment.  The Employee Guidebook version provided by Plaintiff is not materially or substantially similar to the document that he was given to sign.  When Simms was terminated in June 2009, he was notified that he would need to return his laptop computer and phone equipment, but at no time during the exit interview was he asked about the return of company information.  After the exit interview and prior to returning the laptop, he did not download or copy any files or information belonging to LexJet.

Simms admits that Big Dog is in possession of two sets of LexJet customer data. Big Dog has a copy of LexJet's team leader spreadsheets from 2006, which Simms saved in 2006 for review and use at home.  This Excel spreadsheet reflects information concerning customers' names, 2006 purchase history, State and market segment, and the name of the sales rep.  He maintains that information on these spreadsheets has not been updated, is out of date, and of no commercial value at present in light of the technological and market changes. Such was not used systematically by Big Dog and is not used currently.  The second set of customer data in Big Dog's possession which originated at LexJet is in the form of prospect or lead lists used by LexJet's sales reps.  These lists were not marked confidential and were freely circulated.  He urges that these lists contain prospects and customer name, but were not

an active database, have not been updated, and do not reflect products purchased, prices, or other transactional data.  At some point, Simms combined the various lists into a single spreadsheet -- the "2009 Prospect List."  Because it contained customer email contact addresses for various companies, Big Dog used it as a basis for six "blast" emails sent out in 2013.  The emails were not successful in generating more than a minimal amount of business because a large percentage of the emails came back as undeliverable, and of those emails that were delivered, almost no one clicked through to the attached advertisement of Big Dog's products.[9]  As for pricing information, Simms claims that in 2010 he received a 2006 price list from another supplier who had received it from a customer.  It was marked confidential but was four years old when received, obsolete, and of no competitive value.  In short, Simms states that the LexJet information he kept or was later provided was not and is not of any competitive value.  Other than the 2009 Prospect List that was used for the email blasts, no other information in Big Dog's possession that originated from LexJet was ever used by Defendants on a recurring basis or is currently being used for any purpose.

---

[9]In support, the Declaration of Adam Simms, Vice President of Big Dog, establishes that six emails were sent between June 20 and December 15, 2013.  Some of the emails used in these campaigns were obtained from the 2009 Prospect List.  Out of a total of 49,185 emails that were sent, 18,367 were undeliverable.  Of the 30,818 emails that were sent to valid email addresses, 16.44% were opened, and of those opened, 1.31% clicked on the attached advertisement.  The email campaigns generated a total of fifty-seven customer interactions and only nine new customers.  The gross profit to Big Dog from these nine sales was $267.87.  Big Dog paid an outside vendor $1,735 to conduct this email campaign, placing Big Dog in a net loss position.  Since the campaign was not profitable, Big Dog terminated the service with the vendor.  (Doc. 26).

II.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the court can enter a final decision on the merits of the case. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (quoting *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000) (citations omitted). A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.06(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

III.

A.

LexJet claims entitlement to preliminary injunctive relief on its contentions that Defendants have:  violated the Florida Uniform Trade Secrets Act ("FUTSA"); engaged in unfair competition; breached fiduciary duties and an implied covenant of good faith and fair dealing; and in Simms' case, breached the terms of the Employee Guidebook.  On this Motion, LexJet bases its request for a preliminary injunction on the claim that its customer lists and pricing information are trade secrets that have been misappropriated by Defendants; that Defendants' conduct is otherwise in breach of contract, and in the case of Simms and Cudzilo in breach of their fiduciary duties owed to LexJet; and the Defendants' conduct constitutes unfair competition.

In reply, Defendants urge that LexJet has not adequately established that its customer and pricing lists are trade secrets.  Thus, LexJet has not adequately defined its alleged secrets; nor does it keep its customer information secret, as LexJet's customer information is readily ascertainable from public sources; and its pricing information is subject to discovery in a competitive market.  Defendants' argue that LexJet's customer information does not provide a competitive advantage and the only LexJet information in Big Dog's possession is obsolete and cannot be considered a trade secret.  Moreover, they assert that Barrett Simms is not bound by an enforceable non-compete agreement.

Upon consideration, I conclude that LexJet's request for preliminary injunctive relief should be denied.  In short, while LexJet demonstrates that it is substantially likely to prevail on its claim of breach of contract by Simms in that Mr. Simms and his company, Big Dog,

13

have possession of some LexJet customer information which Simms obtained during his employ with LexJet and the retention and use of such is in breach of the terms of the Employee Guidebook, it fails to establish the requisite irreparable harm from such breach to support entry of a preliminary injunction.[10]  As discussed hereafter, on this proffer of evidence, I decline to find that the customer information that was taken by Simms and remains in Big Dog's possession (which is not well-identified on these pleadings) is trade secret information or that Defendants have engaged in unfair competition in connection with the LexJet information they possess.  Thus, while LexJet makes a plausible showing that Simms' retention of the customer information was improper under the provisions of the company's Employee Guidebook, the harm to LexJet as demonstrated on this Motion is *de minimus* and fully remediable by way of its claim for damages.  Moreover, a balancing of the harms in this case suggests that the harm to LexJet in the court's denial of injunctive relief is minimal compared to the harm that would befall Defendants were the court to grant the injunction sought by LexJet.  No Defendant was the subject of a non-compete agreement, and Defendants are not precluded from engaging or attempting to engage in business with any of

---

[10] To establish the breach of contract claims under Florida law, Plaintiff must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (applying Florida law).  As for breach of implied contract and breach implied covenant of good faith and fair dealing, "Florida courts use breach of contract analysis to evaluate claims of breach of contract implied in fact and breach of the covenant of good faith and fair dealing. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325-26 (11th Cir. 2012) (citing *Baron v. Osman*, 39 So. 3d 449, 451 (Fla. Dist. Ct .App. 2010) (contract implied in fact);  *Hospital Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998) (implied covenant of good faith and fair dealing)).  Although disputed, it appears that Simms signed an Employee Guidebook which did contain restrictions on use of customer and pricing information during and after employment.

14

LexJet's former or current customers.  Even if Plaintiff could prevail in demonstrating that Defendants have somehow engaged in common law unfair competition, it demonstrates no irreparable harm or ongoing or threatened harm which would necessitate preliminary injunctive relief.[11]

Regarding Plaintiff's arguments under FUTSA, I am unable to conclude on this Motion the relative merits of the claim.  In short, Plaintiff here argues in broad terms and "on information and belief" that Defendants possess its "Customer List" and "Pricing List" and urges that such are confidential and trade secret information.  However, by Plaintiff's proffer, it is entirely unclear just what information is possessed by Defendants and that such particular information merits trade secret protection.  While it asserts broadly that the particulars of its Customer List and its Pricing List should merit trade secret protection, the Court is left to speculate whether Defendants even have such information.  Moreover, on this proffer, it appears the correct conclusion that any pricing information Defendants may have was not misappropriated but came to them through another competitor.  In any event, the information that may be on a 2006 customer and price list is quite dated and appears to have little, if any, competitive or economic value.  Defendants' possession and conceded past use of the customer email addresses is not shown to be continuing.  Stated otherwise, there appears no imminent threat that the customer information or pricing information will be misused.

---

[11]This record permits no finding of impropriety by Mr. Cudzilo.  Indeed, apart from showing that he went to work with Big Dog after leaving LexJet, which he was free to do, there is no showing of any impropriety by Cudzilo which might support injunctive relief.

Plaintiff is correct that Florida courts have held that active customer and pricing lists constitute trade secrets.[12]  *See Cytodyne Technologies, Inc. v. Biogenic Technologies*, 216 F.R.D. 533, 535 (M.D.Fla. 2002)(citing *Sethscot Collection, Inc. v. Drbul*, 669 So.2d 1076, 1078 (Fla. 3d DCA1996); *Vas Aero Services, LLC v. Arroya*, 860 F.Supp. 2d 1349, 1359 (S.D.Fla. 2012).  Moreover, misappropriation of the same warrants injunctive relief under FUTSA.  *See Vas Aero* at 1360-62; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F.Supp. 1555, 1558 (S.D.Fla. 1992).  Florida law presumes irreparable harm where trade secrets are misappropriated.  *Southeastern Mechanical Services, Inc. v. Brody*, No. 8:08- cv-1151-T-30EAJ, 2008 WL 4613046 (M.D.Fla. Oct. 15, 2008).

To establish a claim for misappropriation of trade secrets, the plaintiff must establish that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it."  *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.02).  However, "an employer may not preclude its former employee from 'utilizing contacts and expertise gained during his former employment.'"*Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (citing *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 290 (Fla. 2d

---

[12]Under Florida law, a "trade secret" includes:
[i]nformation, including a . . . compilation, . . .that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure ot use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.
Fla. Stat. § 688.002(4).

DCA 1989)).  In an action involving alleged trade secrets, "the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Id.*

On this proffer, Plaintiff inadequately demonstrates that Plaintiff misappropriated actual trade secret information.  While Plaintiff speaks broadly of Defendants having and using its secret customer lists including edits to the lists and its pricing lists and using the same to its competitive disadvantage, such is not clearly demonstrated on this Motion.  LexJet simply does not demonstrate what customer or pricing information was taken by Simms or what portions of the same merit trade secret protection.  Nor does it show that Simms' description of the information he brought from LexJet to Big Dog -- a 2006 customer list and a 2009 Prospect List -- is inaccurate.  Moreover, it appears that LexJet did not keep its customers secret and its pricing could be obtained by customers and competitors through proper means.  While particular matters included on these lists might well qualify as trade secret information deserving of protection, it is unclear that Defendants possess such or that such information is not so dated as to make it of no competitive value to Defendants.  Moreover, there is nothing presented to contradict Simms' claim that the 2006 pricing list came to him, not by way of "misappropriation" in contemplation of Florida law, but by way of another supplier who received the same from a customer.  While Simms admits that Big Dog did use LexJet's customer information in compiling its own 2009 Prospect List and that such list was used in email blasts in 2013 in an effort to develop new business, any harm from that appears readily quantifiable.  Finally, I find no clear evidence of continuing and imminent threat to LexJet in these circumstances.

17

Moreover, while LexJet claims to employ procedures for maintaining the secrecy of its customer and pricing information, it is wholly unclear that these procedures or practices were in place during Simms' employ.[13]  Indeed, of those practices purportedly employed by LexJet to advise employees of the secret nature of its confidential information and to assure continued secrecy of the same, it proffers only that Simms signed an Employee Guidebook that had a confidentiality provision therein.  Further, it appears generally correct that LexJet did not seek to keep the identity of its customers secret and indeed used customer names and anecdotes to market it products.  In any event, the identity of LexJet's customers was and is ascertainable by competitors by proper means and thus deserves no protection.  Similarly, pricing information itself could be obtained by customers and by competitors through entirely proper means.

In sum, I cannot agree on this proffer that Plaintiff is substantially likely to prevail on the FUTSA claim.  As the case is further developed it may well prevail, but I do not recommend injunctive relief at this time on this claim.

As for Plaintiff's contention that it is also substantially likely to succeed on its claims of unfair competition, Florida common law dictates that the plaintiff establish: "(1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion.

---

[13]According to the Lambert declaration, LexJet maintains its customer and pricing information on password protected computers and such is not made available to its customers or non-employees.  LexJet requires new employees to sign an Employee Guidebook that contains a confidentiality provision requiring confidential and proprietary information including customer and pricing information not be disclosed to third parties during or after employment.  Since 2006, it has required employees to sign an information security policy form by which they acknowledge that the company computers, software, and storage media contain proprietary and confidential information that is and remains the property of LexJet and which may not be copied, duplicated, or disclosed.  (Doc. 7-1).

The Florida common law of unfair competition is an 'umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1324-25 (M.D. Fla. 2007) (citations omitted) (applying Florida law).

Plaintiff argues that Defendants were without justification in misappropriating and using its customer and pricing lists, and the Court should enjoin such dishonest acts from occurring. On this proffer, Plaintiff makes an insufficient showing that Simms' conduct or that of Big Dog was fraudulent or deceptive or that it in any way was or is likely to result in consumer confusion. Here, neither Simms nor Cudzilo were a party to or the subject of a non-compete agreement with LexJet. The fact that they now seek to obtain business from customers of LexJet is, alone, of little consequence. As noted above, an employer may not preclude its former employee from utilizing contacts and expertise gained during his former employment. *Am. Red Cross*, 153 F.3d at 1410. Here, both parties describe the industry as one that is highly competitive, particularly with regard to pricing. Customers appear to seek out the best pricing deals regardless of the dealer. A November 14, 2013, email from a customer to Big Dog evidences that customers forward on price quotes from LexJet to Big Dog in order to obtain competitive pricing. Thus, it appears that business is won by courting customers and providing good customer service and low prices. In a somewhat different context, the Eleventh Circuit, applying Florida law, has stated that "mere self-interested and competitive solicitation will not constitute tortious interference . . . so long as the third party does not induce the breach of or interference with [an] existing contract." *Ahern v. Boeing*

*Co.*, 701 F.2d 142, 145 (11th Cir. 1983).  Here, there is no demonstration that Defendants have engaged in improper, deceptive, or fraudulent practices to interfere with the business relationships of Plaintiff.  As stated above, any harm caused by Defendants use of the customer list or pricing lists in the proffered circumstances appears quantifiable and remediable by way of monetary damages.

Plaintiff also claims there is substantial likelihood that it will prevail on its breach of fiduciary duty claim against Defendants.[14]  Florida law recognizes an employee's duty of loyalty and good faith.  *Mortgage Now, Inc. v. Stone*, No. 3;09cv80-MCR/MD, 2012 WL 4478950 (N.D.Fla. Sept. 20, 2012)(citing *Fish v. Adams*, 401 So.2d 843, 845 (Fla. 5th DCA 2002)).  "Generally, absent a noncompete agreement, an employee does not run afoul of this duty by planning or organizing a rival company after terminating his or her employment. . . . However, an 'employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of employment or soliciting customers and other employee prior to the end of employment."  *Id.*(citations omitted).  Moreover, an employee may take a customer list that he develops himself.  *Fish* at 845.

Again, Plaintiff cites to Simms' taking of the customer information to support its breach of fiduciary duty claim.  On the basis of the present proffer, I am unable to conclude that Plaintiff is substantially likely to prevail on this claim.  While Simms admits to using

---

[14]Under Florida law, "[b]reach of fiduciary duty requires proof of (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach."  *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1361-62 (S.D. Fla. 2012)(citing Florida law).

LexJet's customer and pricing databases and to downloading customer information during his employ with LexJet, there appears nothing improper with that in and of itself.  And, the proffer is lacking on any evidence that when such was done, it was undertaken in anticipation of Simms becoming a competitor of LexJet.  Plaintiff cites no case law that  suggests retaining such material alone will support the claim.  Again, while further development of the facts may reveal more, on the basis of this proffer I cannot agree that this claim supports the request for injunctive relief.

## B.

As suggested above, I conclude that Plaintiff also fails to demonstrate the irreparable harm necessary for entry of injunctive relief.  Irreparable harm is the *sine qua non* of injunctive relief.  *Siegal v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000)(citing *Northeastern Florida Chapter of the Association of General Contractors of America  v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)(quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)).  "The injury must be 'neither remote nor speculative, but actual and imminent.'"  *Northeastern Florida Chapter* at 1285 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F. 2d 969, 973 (2d. Cir. 1989)).  And, an injury is "irreparable" only if it cannot be undone through monetary remedies.  *Id.*  "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Siegel*, 234 F.3d at 1176.  As measured against this standard, Plaintiff is not entitled to injunctive relief on this Motion.

Plaintiff argues that the Court can presume under FUTSA and otherwise irreparable injury in the circumstances of this case.  It urges that even without the presumption, it is irreparably harmed because it is impossible to determine fully its damages.  Moreover, injunctive relief is necessary to protect LexJet's stability and to discourage competitor companies from inducing LexJet's employees to breach their agreements and to divert trade secrets.  Plaintiff has expended significant resources in establishing customer relationships, and Defendants' use of its customer and pricing lists cause LexJet to continue to suffer lost business.  In contrast, Defendants will suffer little or no harm because of their ability to solicit new customers.  (Doc. 5).  In opposition, Defendants argue that Plaintiff has not and cannot show that the conduct at issue will continue and is likely to occur in the future.  Moreover, Plaintiff's economic injury for any past lost sales that can be shown as a result of Defendants' breach can be adequately compensated by way of compensatory damages.  On the other hand, Big Dog will suffer substantial irreparable harm to its business if injunction is granted since it would be unable to compete fairly in the marketplace.  (Doc. 24).

Here, Plaintiff does not show the type injury necessary to support the claim for injunctive relief.  Any harms caused by the use of its customer data appear to be past harms, which should be quantifiable and capable of remedy via an award of damages.  In any event, Defendants' use of LexJet customer emails on Big Dogs' 2009 Prospect List is not shown to have injured Plaintiff in any lasting or significant way nor provided Big Dog with any significant gains.  On the contrary, Defendants' gains appear minimal.  And, there appears no real threat that Defendants can or will use 2006 pricing information in any effective way to harm LexJet.  Again, Defendants are not restrained by any noncompete agreement and thus

22

may seek to compete with LexJet customers for new business as long as they do not engage in unfair competition or improperly interfere with contractual relationships. Plaintiff's efforts to restrain that competition through injunctive relief goes too far and is not the appropriate remedy for such lost business as it may prove. In sum, I cannot find irreparable harm on this Motion.

C.

On the above findings, the Court need not evaluate the remaining two requirements for injunctive relief. However, I do note that in balancing the respective harms, it is apparent that the lack of a preliminary injunction in favor of LexJet will cause LexJet little harm going forward while the entry of an injunction on the terms outlined above would cause a substantial disruption in Big Dog's ongoing business and far more harm. Finally, while I fully respect and agree that proprietary and trade secret information is entitled to the full protection of the law and that the protection of same in appropriate circumstances is in the public interest, such protection is not warranted on this Motion.

IV.

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction (Doc. 5) should be denied. Accordingly, it is so recommended.

Respectfully submitted on this

16th day of September 2014.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

23

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.


Copies to:
United States District Judge
Counsel of Record